# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

RICHARD MARTIN LEWISTON

    Debtor.

Case No: 12-58599-pjs
Chapter 7
Honorable Phillip J. Shefferly

_____/

DANIEL SMITH, RICHARD SMITH and
JOANNE PURTHER,

      Plaintiffs,

vs.

RICHARD MARTIN LEWISTON,

      Defendant.

Adv. Pro. No.

_____/

## COMPLAINT OBJECTING TO DEBTOR'S DISCHARGE
## PURSUANT TO 11 U.S.C. § 523

NOW COME Plaintiffs, Daniel Smith, Richard Smith and Joanne Purther, by and
through their attorneys, Morganroth & Morganroth, PLLC and Sullivan, Ward, Asher & Patton,
P.C., of counsel, and, for their Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C.
§ 523, hereby state as follows.

### PARTIES AND JURISDICTION

1.    Plaintiff, Daniel Smith, is a resident of the Eastern District of Michigan, Southern
Division.

2.    Plaintiff, Richard Smith, is a resident of the Eastern District of Michigan,
Southern Division.

3.    Plaintiff, Joanne Purther, is a resident of the Eastern District of Michigan,

1

Southern Division.

4.    Defendant, Richard Martin Lewiston ("Lewiston"), is a resident of the Eastern District of Michigan, Southern Division, and has conducted business herein at all times relevant hereto.

5.    On August 13, 2012, Lewiston filed his Voluntary Petition under Chapter 7 of the Bankruptcy Code which presently pends in this court.

6.    This adversary proceeding seeks a judgment that the Defendant is not entitled to a discharge under 11. U.S.C. § 523[1] and it is therefore a core proceeding within 28 U.S.C. § 157(b).

7.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    The bar date for filing proofs of claim is January 14, 2013.

## GENERAL ALLEGATIONS

**A.    THE LEWISTON/SMITH BUSINESS RELATIONSHIP.**

10.    Plaintiffs, Daniel Smith, Richard Smith and Joanne Purther (collectively, the "Smiths"), and Lewiston have a business relationship that stretches back to approximately 1982.

11.    Milton Smith, who was married to Joanne Purther, and the father of Daniel Smith and Richard Smith, owned a portion of a property management company that managed a large number of apartment buildings.  Lewiston was also in the property management business managing a large number of apartment buildings.

---

[1]    Reference to the Bankruptcy Code are to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, as amended from time to time and should hereafter be referred to as "Section _____."

2

12.     In 1982, Lewiston effectively merged with Milton Smith, and the parties formed a company which ultimately became Defendant, Lewiston-Smith Realty Corporation, to serve as the de facto parent/management company of their respective property management companies.

13.     Unfortunately, Milton Smith passed away around the time of the merger, so Daniel Smith took his father's place in the business by maintaining his father's ownership interest in the various property management companies while working at Lewiston-Smith Realty Corporation managing the parties' various apartment buildings.

14.     Beginning in or around 1987, Lewiston invited the Smiths to invest in several real estate development projects that Lewiston was undertaking, and the Smiths accepted.  Initially, the Smiths invested in certain Lewiston projects in their own names, as did Lewiston.  Later, as Lewiston and the Smiths undertook additional projects, Lewiston and the Smiths invested in those additional projects through their original projects.  In other words, Lewiston and the Smiths would reinvest their proceeds from their original projects in their additional projects.  For the sake of convenience, all of the real estate development projects which the Smiths co-own with Lewiston are collectively referred to hereinafter as the "Lewiston Projects."

15.     Over the years, the Lewiston Projects appeared to enjoy substantial success which deepened the familial relationship between the Smiths and Lewiston, as well as the implicit trust that the Smiths placed in Lewiston as their business partner and, essentially, the patriarch of their business by virtue of the Lewiston Projects and the other companies that Lewiston managed and co-owned with the Smiths.  Such companies include, but are not limited to, 21790 Associates, Cambridge Development Associates, Chelsea Fairways, L.L.C., Fairway West Associates, Founders Woods Associates, Glengarry Development Associates, Island Lake Associates, Lewiston-Smith Development Associates, Lewiston-Smith Realty Corporation, Pilgrim Village

Associates, Stoneleigh Development Corporation, Sullivan-Smith, Inc. and Sunflower Seven Associates.

**B.** **THE SMITHS DECIDE TO DISCONTINUE REINVESTING THEIR PROCEEDS FROM THE LEWISTON PROJECTS.**

16.     In or around 1999, Daniel Smith was having a breakfast meeting at the Big Boy restaurant in Bloomfield Hills with Lewiston during which time Daniel Smith informed Lewiston on behalf of himself, his brother and his mother that the Smiths did not want to invest or reinvest any of their funds in any new real estate projects on the basis that the Smiths were satisfied with the quantity and quality of their investments in the Lewiston Projects and, inasmuch as they could not enjoy any proceeds from the Lewiston Projects when such proceeds were reinvested in other projects, the Smiths wanted to simply receive their distributions from the Lewiston Projects instead of reinvesting such funds in additional projects.

17.     In the latter part of 1999, Lewiston undertook a new project, Apartments at Cambridge Company, L.L.C. ("Apartments at Cambridge").  Based upon Daniel Smith's instructions, the Smiths' interests in Apartments at Cambridge were immediately sold to honor the Smiths' request that they not be included in any new real estate projects.

18.     Lewiston's daughter, Leslie Lewiston Etterbeek ("Leslie Lewiston"), is a co-owner of Apartments at Cambridge, and she also maintains ownership interests, direct and/or indirect, in a number of the Lewiston Projects including, but not limited to Chelsea Fairways, L.L.C., Fairway West Associates, Founders Woods Associates, Glengarry Development Associates, Island Lake Associates and Stoneleigh Development Corporation.

**C.** **THE SEPTEMBER 10, 2007 MEMORANDUM.**

19.     In or around the fall of 2006, Daniel Smith was going through a divorce wherein inquiry was made about future payments that would be made to Daniel Smith from the Lewiston

4

Projects. Additionally, Richard Smith's accountant, pointed out to him that he (Richard Smith) had paid taxes on his capital accounts in the Lewiston Projects (which was also true for Daniel Smith and Joanne Purther), and the accountant inquired when the Lewiston Projects would be completed such that Richard Smith's capital accounts would be paid out to him.

20.     Daniel and Richard Smith then asked Lewiston in person, in the fall of 2006, when the Smiths could expect to receive distributions and the balance of their capital accounts in the Lewiston Projects since the Lewiston Projects should have been in the final stages, winding up and/or completed by that time. In response, Lewiston promised and assured Daniel and Richard Smith that the Smiths' capital accounts would be paid out to them in full by the spring of 2007. However, while Lewiston did make some distributions to the Smiths in 2007, the majority of the Smiths' capital accounts had not been paid out to them by the fall of 2007.

21.     On or about Friday, September 7, 2007, Daniel and Richard Smith went to the Lewiston-Smith Realty Corporation office to obtain the partnership, operating and shareholder agreements for the Lewiston Projects and review the provisions for distributions, including payment of ending capital accounts. During their review, a document in the office caught Richard Smith's attention. The document was a memorandum (the "September 10, 2007 Memorandum") from Lewiston to Lewiston's file, with handwritten revisions to be made for Monday, September 10, 2007, in the purple ink that Lewiston exclusively uses on his business records, listing a number of purported loans that had been made to Apartments at Cambridge.

22.     Daniel and Richard Smith were perplexed by the September 10, 2007 Memorandum because it showed that, among the purported loans that were made to Apartments at Cambridge, in excess of $3 million came from the Lewiston Projects even though the Smiths do not own any interest in Apartments at Cambridge. In other words, the September 10, 2007

5

Memorandum showed that Lewiston had diverted more than $3 million from entities in which the Smiths own an interest to Apartments at Cambridge in which the Smiths do not own any interest.

23.     Daniel and Richard Smith were further perplexed by the September 10, 2007 Memorandum because Lewiston had never requested, let alone obtained, the Smiths' permission to make any loans or transfers from the companies in which the Smiths hold ownership interests to Apartments at Cambridge even though the companies' respective partnership, operating and shareholder agreements require that all loans must be unanimously approved by all of the owners.

**D.     THE LEWISTON/BROWN LITIGATION.**

24.     In or around February of 2008, Daniel Smith received a call from Joanne Purther telling him that she had been informed by her stepson, Thomas Purther, that Daniel Smith was a named plaintiff in a lawsuit that was being brought by Lewiston against Jeff Brown ("Brown"). Brown had been an employee of the Lewiston-Smith Realty Corporation from approximately 1988 to 1996, and Brown also maintained an interest in some of the Lewiston Projects.

25.     Richard Smith obtained a copy of the complaint (the "Lewiston/Brown Litigation"), and provided it to Daniel Smith.  The complaint was troubling to Daniel Smith because he had never been informed by Lewiston that there were any alleged issues with Brown. Furthermore, although the complaint indicated that Daniel Smith was being represented by Michael Jacobson ("Jacobson") of Jaffe, Raitt, Heuer & Weiss, P.C. (the "Jaffe Firm"), a former friend and tennis partner, neither Jacobson nor Lewiston had ever informed Daniel Smith that he was a party to the Lewiston/Brown Litigation.  At no time had Daniel Smith signed any retention agreements with or authorized Jacobson or the Jaffe Firm to represent him in the

Lewiston/Brown Litigation.

26.     When Daniel Smith confronted Lewiston about the lawsuit, Lewiston stated that Daniel Smith did not need to worry about the matter because Lewiston was handling it.  Neither Lewiston nor Jacobson nor any of the attorneys or employees of the Jaffe Firm informed Daniel Smith that he was being counter-sued by Brown for allegedly acting in unison with Lewiston and Leslie Lewiston to divert millions of dollars from the Lewiston Projects.

27.     After being told by Lewiston not to worry about the Lewiston/Brown Litigation, Daniel Smith, on behalf of himself and the Smiths, periodically asked Lewiston during 2008 about distributions of the balance of the Smiths' capital accounts in the Lewiston Projects.  In response, Lewiston continued to assure him and represented the facts to be that the capital accounts would be paid in full to the Smiths.  By 2009, however, the balance of the Smiths' capital accounts in the Lewiston Projects had not been paid, nor had the Smiths been repaid for their respective interest in the unauthorized loans to Apartments at Cambridge.

E.     THE SMITHS' RETENTION OF COUNSEL TO PURSUE THIS CASE.

28.     Daniel Smith was subpoenaed to testify at a February 2009 evidentiary hearing in the Lewiston/Brown Litigation.  Although Lewiston sat in on the hearing, Lewiston and Jacobson had Daniel Smith sit outside of the hearing in a waiting room so that Daniel Smith, despite being a party to the Lewiston/Brown Litigation, could not hear any of the testimony or see any of the exhibits which would demonstrate that the Lewistons had diverted millions of dollars from the Lewiston Projects, above and beyond the more than $3 million that were diverted to Apartments at Cambridge.

29.     During the hearing, Lewiston had Jacobson leave the hearing to tell Daniel Smith that he needed to testify that intercompany loans between and among the various entities that

Lewiston was managing was a normal business practice even though this was not true and would have been an improper practice in violation of the entities' respective partnership, operating and shareholder agreements. Daniel Smith told Jacobson that he would not provide such false testimony whereupon Jacobson, at Lewiston's behest, informed Daniel Smith that he was not going to be called to testify and that he could leave even though Brown's counsel had subpoenaed Daniel Smith and had not excused him from testifying.

30.     Based upon Lewiston's behavior and request for false testimony, the Smiths approached Morganroth & Morganroth, PLLC suspecting that Lewiston might have diverted and taken their funds from and interests in the Lewiston Projects and other companies that they co-own with Lewiston. Upon reviewing some of the underlying records that Lewiston had produced to Brown, the Smiths discovered that Lewiston's diversion had in fact gone well beyond the more than $3 million that was diverted to Apartments at Cambridge.

31.     Specifically, the underlying records showed that Lewiston had been diverting and taking substantial funds from the Lewiston Projects and other companies that the Smiths co-own with Lewiston on a regular basis solely for his (Lewiston's) and his family's benefit and in complete disregard of the Smiths' ownership interests. Lewiston's actions and diversion of funds were all the more shocking because the Lewiston Projects were not conducting any business so they should not have had open bank accounts for Lewiston to use as revolving doors to divert any funds, let alone the millions of dollars belonging pro rata to the Smiths. The lending practices of Lewiston were totally unauthorized and contrary to Lewiston's representations to the Smiths which concealed and secreted the "loans" from various of the Lewiston Projects and other companies that Lewiston owns with the Smiths to companies in which Lewiston had an interest and Smith did not have any interest.

8

32.    On March 5, 2010, the Smiths filed a 19-count Complaint against Lewiston and the other related Defendants in the Oakland County Circuit Court, Case No. 10-108330-CZ, the Honorable Martha D. Anderson presiding (the "Smith Action").  The Smiths' claims included statutory and common law conversion, breach of fiduciary duty and willfully unfair and oppressive conduct pursuant to the Michigan Limited Liability Company Act and the Michigan Business Corporation Act, among other claims.  The Smiths also alleged piercing the company veils against Lewiston on the basis that Lewiston operated the Lewiston Projects and the other companies that he co-owns with the Smiths as his alter egos for his own benefit and to the Smiths' exclusion and detriment.

33.    At no time during the Smith Action did Lewiston raise any substantive defenses to the Smiths' claims and damages.

34.    For nearly one year during the Smith Action, the parties appeared before the Honorable Gene Schnelz, the Court-appointed (by stipulation) Discovery Master.  At the outset of discovery, Lewiston took the position that, in addition to the books and records that the Smiths' counsel already maintained from the Lewiston/Brown Litigation, Lewiston should only produce the books and records for one company at a time, contending that the records were voluminous and should be reviewed one company at a time to determine whether Lewiston even disagreed with the Smiths' expert's determination as to damages for each company.  The Discovery Master partially agreed and ordered Defendants to produce the books and records for four companies through which large amounts of funds were diverted.

35.    At a follow-up hearing before the Discovery Master, Lewiston took the position that, for the sake of economy, the Smiths' forensic accounting expert should simply compile a

preliminary expert report and that further discovery would not be required if Lewiston did not contest the report. The Discovery Master agreed with Lewiston's suggested approach, and the Smiths' Expert Report was submitted on June 30, 2011 showing that Lewiston diverted $10,511,022 that rightfully belonged to the Smiths from the Lewiston Projects and other companies that the Smiths co-own with Lewiston. The Smiths' Expert Report was never contested by Lewiston.

36.     On October 18, 2011, the day of trial in the Smith Action, Lewiston and the Smiths reached a settlement agreement.

37.     Lewiston, however, breached the settlement agreement right off the bat which resulted in a judgment being entered against him in the amount of $1.5 million on February 8, 2012.

## G.     LEWISTON TRANSFERS ASSETS AND FILES FOR BANKRUPTCY.

38.     After the time to appeal the judgment expired without Lewiston filing an appeal, the Smiths began the process of serving garnishments to collect on their Judgment.

39.     Specifically, the Smiths served periodic and non-periodic garnishments upon the companies through which Lewiston owns an interest in the Pilgrim Village Apartments (Pilgrim Village Associates, 21790 Associates and PVA Associates Limited Partnership) in March and April of 2012. The Smiths chose these entities because: (a) Daniel Smith and Joanne Purther maintain ownership interests in the Pilgrim Village Apartments; and (b) Lewiston had obtained refinancing for the Pilgrim Village Apartments wherein Lewiston was going to receive distributions in excess of $400,000 based upon a memorandum that he sent to the Smiths regarding the refinancing.

40.     The Smiths also served a garnishment upon Raymond James & Associates, Inc. in

March of 2012 because Lewiston had maintained investment accounts with that company for many years.

41.     The Smiths also served a garnishment upon The Heights Apartments Limited Partnership in March 2012 based upon a news article effectively stating that Lewiston had purchased that property.

42.     On March 22, 2012, Raymond James & Associates, Inc. executed a garnishee disclosure indicating that Lewiston no longer maintained any assets with them.

43.     On or about March 28, 2012 and April 12, 2012, the Smiths received garnishee disclosures that were inexplicably signed by Leslie Lewiston purporting to be the General Partner of the Pilgrim Village Apartments ownership entities in place of Lewiston.  The garnishee disclosures stated that the Pilgrim Village Apartments ownership entities were not indebted to Lewiston or in possession of any of his assets even though Lewiston was slated to receive refinancing distributions in excess of $400,000 according to the memorandum that he had previously sent to the Smiths as the General Partner of the Pilgrim Village Apartments.

44.     Also on or about March 28, 2012, the Smiths received a garnishee disclosure signed by Lewiston's son-in-law, Jeffrey Etterbeek, as the General Partner of The Heights Apartments Limited Partnership stating that the company was not indebted to Lewiston or in possession of any of his assets.

45.     Upon receiving the foregoing garnishee disclosures, the Smiths attempted to schedule a creditors' examination of Lewiston in June and July of 2012 to explore Lewiston's apparent transfer of his assets.  In June and July of 2012, Lewiston repeatedly caused his creditors' examination to be rescheduled for a number of purported reasons even though he had agreed to such dates.  With the Smiths' creditors' examination finally scheduled to commence on

August 1, 2012 pursuant to the parties' agreement on or about July 13, 2012, Lewiston submitted a letter to the Smiths' counsel, dated July 20, 2012, stating that he would be filing for Chapter 7 bankruptcy.

46.     As set forth in the Smiths' Complaint Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 727 which was filed against Lewiston concurrently with this Complaint, Lewiston filed a Summary of Schedules, Schedules A through J, a Declaration Concerning Debtor's Schedules and a Statement of Financial Affairs on August 27, 2012.  Lewiston also filed an Amended Schedule B and an Amended Statement of Financial Affairs on September 17, 2012. Absent from these bankruptcy filings with the Court was an accounting for the more than $32 million in net income declared by Lewiston in 2006 as well as for the $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007.

47.      Also absent from Lewiston's bankruptcy filings with the Court was a disclosure of Lewiston's ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets (in the form of real property, apartments, rent, management fees, etc.), including, but not limited to:

        A.        FQA Associates, LLC;

        B.        Pilgrim Village Associates;

        C.        The Richard M. Lewiston Company;

        D.        PVA Associates Limited Partnership;

        E.        Stratford Apartments, LLC;

        F.        The Heights Apartments Limited Partnership;

        G.        The Heights Group, LLC;

        H.        Greentrees Apartments Limited Partnership;

I.      Sullivan-Smith, Inc.;

J.      Practical Management Company;

K.      Green Acres Associates Limited Partnership;

L.      Tap Liquidating Company, LLC;

M.      RSJC Associates Limited Partnership;

N.      Cambridge Development Associates;

O.      Island Lake Associates;

P.      Founders Woods Associates;

Q.      Fairway West Associates;

R.      Sunflower Seven Associates;

S.      Summer Park Associates, LLC;

T.      Practical Development Co.;

U.      Practical Home Builders, Inc.;

V.      Starlight Homes, Inc.;

W.      Coolidge Commercial Associates, LLC;

X.      Southpointe Square Apartments Limited Partnership;

Y.      Sterling Lake Apartments;

Z.      Century Realty Investment Company Limited Partnership;

AA.     Legacy Development Associates, LLC;

BB.     Investment Advisors Company;

CC.     Big Beaver-Rochester Properties Limited Partnership;

DD.     Berger-Lewiston-Smith Realty Corporation;

EE.     B&L Realty Investments Limited Partnership;

FF.     Kingsley-Moravian Company Limited Partnership; and

GG.     Stephenson-Madison Heights Company Limited Partnership.

48.     Based upon the garnishee disclosures that the Smiths received and Lewiston's testimony at the October 25, 2012 continuation of the Creditor's Meeting that his bankruptcy filings of August 27, 2012 and September 17, 2012 were truthful and accurate, it must be the case that Lewiston transferred his ownership interests in the above-referenced companies to his daughter, Leslie Lewiston Etterbeek, his son-in-law, Jeffrey Etterbeek and/or his other relatives or insiders as defined in the Bankruptcy Code. Lewiston made these transfers either within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter.

49.     Lewiston's transfers: (a) were and are intended to hinder, delay or defraud Plaintiffs; (b) were made without receiving a reasonably equivalent value in exchange therefor; (c) done when Lewiston was insolvent or became insolvent as a result of said transfers; (d) after said transfers, Lewiston's remaining assets were unreasonably small in relation to the transfers; and (e) Lewiston believed that he would incur debts beyond his ability to pay as said debts were incurred.

50.     In sum, Lewiston not only diverted and took in excess of $10.5 million from the Smiths, but he also transferred his assets -- money and ownership interests in various companies -- in order to avoid his debt to the Smiths.

## COUNT I
## EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A)

51.     Plaintiffs, the Smiths, hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 50 as if fully restated herein.

52.     11 U.S.C. § 523(a)(2)(A) provides that an individual debtor is not discharged from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to

14

the extent obtained by– false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

53.     Lewiston's debt to the Smiths is excepted from discharge because such debt was obtained by false pretenses, false representations, and actual fraud based upon the following, without limitation.

A.      Lewiston ran the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit and contrary to the interests of and damaging the Smiths.

B.      For the years 2006 forward, the tax returns and K-1 forms prepared for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

C.      In the fall of 2006, Daniel and Richard Smith asked Lewiston when the Smiths would receive distributions and the balance of their capital accounts in the Lewiston Projects.  In response, Lewiston promised and assured them that the distributions and the balance of their capital accounts in the Lewiston Projects would be paid by the spring of 2007.

D.      After Lewiston failed to pay the distributions and capital account balances to the Smiths by the spring of 2007 as he had promised, Lewiston continued to promise and assure Daniel Smith at periodic intervals throughout 2008 that the Smiths' distributions and capital accounts would be paid in full.

E.      By 2009, with the Smiths' distributions and capital accounts still

15

outstanding, Daniel Smith was subpoenaed to testify at a February 2009 evidentiary hearing in the Lewiston/Brown Litigation. Although Lewiston sat in on the hearing, Lewiston and Jacobson had Daniel Smith sit outside of the hearing in a waiting room so that Daniel Smith, despite being a party to the Lewiston/Brown Litigation, could not hear any of the testimony or see any of the exhibits which would demonstrate that the Lewistons had diverted millions of dollars from the Lewiston Projects, above and beyond the more than $3 million that were diverted to Apartments at Cambridge.

F.     During the hearing, Lewiston had Jacobson leave the hearing to tell Daniel Smith that he needed to testify that intercompany loans between and among the various entities that Lewiston was managing was a normal business practice even though this was not true and would have been an improper practice in violation of the entities' respective partnership, operating and shareholder agreements. Daniel Smith told Jacobson that he would not provide such false testimony whereupon Jacobson, at Lewiston's behest, informed Daniel Smith that he was not going to be called to testify and that he could leave even though Brown's counsel had subpoenaed Daniel Smith and had not excused him from testifying.

G.     Had Daniel Smith provided that false testimony requested by Lewiston, he would have unknowingly given sanction to Lewiston's diversion of funds and, consequently, the Smiths' claims in connection therewith.

H.     Lewiston then offered a settlement agreement to the Smiths without any intention of performance because Lewiston's motive was to reduce the Smiths' claim against him and thereby facilitate a bankruptcy discharge in his favor. Had the Smiths known that Lewiston had and was going to transfer his assets and then file for bankruptcy, they never would have agreed to the settlement agreement.

I.      To further avoid his debt to the Smiths and obtain a bankruptcy discharge, Lewiston transferred his assets to his wife, children and his children's spouses within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter. Such assets include more than $32 million in net income declared by Lewiston in 2006 as well as $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007. Such assets further include ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets in the form of real property, apartments, rent, management fees and other assets.

54.      Lewiston's conduct constitutes fraud and false pretenses because it was a mute charade intended to create or foster a false impression from the Smiths that: (a) Lewiston was properly running the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston; (b) Lewiston was going to ensure full payment of distributions and capital account balances to the Smiths in accordance with the Smiths' ownership interests; and (c) Lewiston was going to perform under the settlement agreement. Lewiston's conduct further constitutes fraud and false pretenses because Lewiston failed to disclose material facts -- his diversion of funds from the Lewiston Projects and the other companies in which the Smiths maintain ownership interests, Lewiston's transfer of assets and Lewiston's lack of any intent, let alone present intent, to perform under the settlement agreement -- to avoid his debt to the Smiths.

55.      Lewiston's conduct constitutes a false representation because Lewiston promised, represented and assured the Smiths and conveyed to the Smiths the impression that: (a) Lewiston was properly running the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston; (b) Lewiston was going to ensure full payment of

17

distributions and capital account balances to the Smiths in accordance with the Smiths' ownership interests; and (c) Lewiston was going to perform under the settlement agreement even though none of this was true.

56.     Lewiston's conduct constitutes actual fraud because Lewiston's conduct involved deceit, artifice, trick and design involving direct and active operation of Lewiston's mind to circumvent and cheat the Smiths out of the more than $10,511,022 that was owed to them.

57.     Lewiston's false pretenses, false representations and actual fraud were made for the purpose of preventing the Smiths from discovering, pursuing relief and obtaining relief for Lewiston's diversion of more than $10,511,022 that was owed to them.

58.     The Smiths justifiably relied upon Lewiston's false pretenses, false representations and actual fraud by virtue of the parties' longstanding personal and business relationship.

59.     The Smiths have been damaged by Lewiston's false pretenses, false representations and actual fraud by virtue of the more than $10,511,022 that was owed to them that Lewiston diverted for his and his family's benefit.  At present, the Smiths are uncertain as to the additional amount of their damages because Lewiston, to date, has failed to provide the Smiths with full and complete books and records for all of the companies in which they maintain ownership interests with Lewiston.

WHEREFORE, Plaintiffs, the Smiths, respectfully request that this Honorable Court:

A.     Except the more than $10,511,022 from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(2)(A);

B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.     Grant such other and further relief as is here appropriate.

## EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(B)

60.     Plaintiffs, the Smiths, hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 59 as if fully restated herein.

61.     Section 523(a)(2)(B) provides that an individual debtor is not discharged from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive."

62.     Lewiston ran the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit.

63.     For the years 2006 forward, the tax returns and K-1 forms prepared for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

64.     Lewiston used the tax returns and K-1 forms to convey to the Smiths the impression that: (a) Lewiston was properly running the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston; and (b) Lewiston was going to ensure full payment of distributions and capital account balances to the Smiths in accordance with the Smiths' ownership interests.

65.     The tax returns and K-1 forms were materially false because they reflected so-

19

called intercompany loans as good and proper loans even though such amounts, in reality, were the funds that Lewiston diverted for his or his family's own benefit.

66.     The tax returns and K-1 forms therefore misrepresented Lewiston's financial condition and that of the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston, all of which were Lewiston's alter egos and would insiders by definition pursuant to 11 U.S.C. § 101 in any event.

67.     The Smiths reasonably relied upon the tax returns and K-1 forms for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston by virtue of the fact that: (a) they were representations by Lewiston to the federal and state governments; and (b) by virtue of the of the parties' longstanding personal and business relationship.

68.     Lewiston issued the tax returns and K-1 forms for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston with the intent to deceive the Smiths.

69.     Lewiston issued the tax returns and K-1 forms for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston with the intent to deceive the Smiths for the purpose of preventing the Smiths from discovering, pursuing relief and obtaining relief for Lewiston's diversion of more than $10,511,022 that was owed to them.

70.     The Smiths have been damaged by Lewiston's false statements in the amount of more than $10,511,022.

WHEREFORE, Plaintiffs, the Smiths, respectfully request that this Honorable Court:

> A.     Except the more than $10,511,022 from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(2)(B);
>
> B.     Award interest, cost of collection and attorney fees pursuant to FRBP Rule

7008(b); and

C.    Grant such other and further relief as is here appropriate.

**COUNT III**
**EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(4)**

71.    Plaintiffs, the Smiths, hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 70 as if fully restated herein.

72.    Section 523(a)(4) provides that an individual debtor is not discharged from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

73.    Partners of a partnership owe a fiduciary duty to the partnership pursuant to Section 21 of the Michigan Uniform Partnership Act (MCL § 449.21).

74.    The manager of a limited liability company owes a fiduciary duty to the limited liability company pursuant to pursuant to Section 404 of the Michigan Uniform Limited Liability Company Act (MCL § 450.4404).

75.    Officers of a corporation owe a fiduciary duty to the corporation pursuant to Section 541a of the Michigan Business Corporation Act (MCL § 450.1541a).

76.    Lewiston ran the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit. Therefore, the company veils should be pierced such that Lewiston owed the Smiths a fiduciary duty of care in connection with the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston.

77.    Lewiston diverted more than $10,511,022 that was owed to the Smiths for Lewiston's and Lewiston's family's benefit.

78.     Lewiston's diversion of the more than $10,511,022 that was owed to the Smiths constitutes embezzlement and/or larceny exempting Lewiston's debt to the Smiths from discharge in this bankruptcy.

79.     Lewiston's diversion of the more than $10,511,022 that was owed to the Smiths further constitutes fraud or defalcation while acting in a fiduciary capacity. Instead of holding the more than $10,511,022 in trust for the Smiths and paying such funds to the Smiths, Lewiston diverted these funds for his and his family's benefit.

80.     The Smiths have been damaged by Lewiston's fraud or defalcation while acting in a fiduciary capacity, embezzlement, and/or larceny in the amount of more than $10,511,022.

WHEREFORE, Plaintiffs, the Smiths, respectfully request that this Honorable Court:

A.      Except the more than $10,511,022 from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(4);

B.      Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.      Grant such other and further relief as is here appropriate.

## COUNT IV
## EXCEPTION FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(6)

81.     Plaintiffs, the Smiths, hereby incorporate by reference and reallege the allegations set forth in Paragraphs 1 through 80 as if fully restated herein.

82.     Section 523(a)(6) provides that an individual debtor is not discharged from a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

83.     Lewiston's debt to the Smiths is excepted from discharge pursuant to Section 523(a)(6) based upon the following actions, without limitation, which Lewiston took with malice and with the knowledge and the intent that such actions would and did in fact cause injury to the

Smiths.

A.    Lewiston ran the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston as his alter egos, completely disregarding the company forms and agreements, and treating such companies as his own personal piggy banks where he consistently issued checks without authorization for his or his family's own benefit.

B.    For the years 2006 forward, the tax returns and K-1 forms prepared for the Lewiston Projects and the other companies in which the Smiths maintain ownership interests with Lewiston reflected so-called intercompany loans which, in reality, were the funds that Lewiston diverted for his or his family's own benefit which action.

C.    In the fall of 2006, Daniel and Richard Smith asked Lewiston when the Smiths would receive distributions and the balance of their capital accounts in the Lewiston Projects.  In response, Lewiston promised and assured them that the distributions and the balance of their capital accounts in the Lewiston Projects would be paid by the spring of 2007.

D.    After Lewiston failed to pay the distributions and capital account balances to the Smiths by the spring of 2007 as he had promised, Lewiston continued to promise and assure Daniel Smith at periodic intervals throughout 2008 that the Smiths' distributions and capital accounts would be paid in full.

E.    By 2009, with the Smiths' distributions and capital accounts still outstanding, Daniel Smith was subpoenaed to testify at a February 2009 evidentiary hearing in the Lewiston/Brown Litigation.  Although Lewiston and Leslie Lewiston sat in on the hearing, Lewiston and Jacobson had Daniel Smith sit outside of the hearing in a waiting room so that Daniel Smith, despite being a party to the Lewiston/Brown Litigation, could not hear any of the testimony or see any of the exhibits which would demonstrate that the Lewistons had diverted

millions of dollars from the Lewiston Projects, above and beyond the more than $3 million that were diverted to Apartments at Cambridge.

F.      During the hearing, Lewiston had Jacobson leave the hearing to tell Daniel Smith that he needed to testify that intercompany loans between and among the various entities that Lewiston was managing was a normal business practice even though this was not true and would have been an improper practice in violation of the entities' respective partnership, operating and shareholder agreements. Daniel Smith told Jacobson that he would not provide such false testimony whereupon Jacobson, at Lewiston's behest, informed Daniel Smith that he was not going to be called to testify and that he could leave even though Brown's counsel had subpoenaed Daniel Smith and had not excused him from testifying.

G.      Had Daniel Smith provided that false testimony requested by Lewiston, he would have unknowingly given sanction to Lewiston's diversion of funds and, consequently, the Smiths' claims in connection therewith.

H.      Lewiston then offered a settlement agreement to the Smiths without any intention of performance because Lewiston's motive was to reduce the Smiths' claim against him and thereby facilitate a bankruptcy discharge in his favor. Had the Smiths known that Lewiston had and was going to transfer his assets and then file for bankruptcy, they never would have agreed to the settlement agreement.

I.      To further avoid his debt to the Smiths and obtain a bankruptcy discharge, Lewiston transferred his assets to his wife, children and his children's spouses within one year, but not more than six years, from the date of filing his bankruptcy petition in this matter. Such assets include more than $32 million in net income declared by Lewiston in 2006 as well as $9 million in U.S. Treasury Bills that Lewiston liquidated in 2007. Such assets further include

ownership interests, direct and/or indirect, in more than two dozen different companies with significant if not substantial assets in the form of real property, apartments, rent, management fees and other assets.

84.    Lewiston's conduct was willful as it was done with the intent of preventing the Smiths from discovering, pursuing relief and obtaining relief for Lewiston's diversion of more than $10,511,022 that was owed to them and intentionally causing injury.

85.    Lewiston's conduct was further willful because, at a minimum, Lewiston believed that his conduct was substantially certain to result in the Smiths being prevented from discovering, pursuing relief and obtaining relief for Lewiston's diversion of more than $10,511,022 that was owed to them.

86.    Lewiston's conduct was malicious and intended to cause injury to the Smiths as it was committed without any justification or excuse whatsoever.

87.    Lewiston's conduct was also malicious as it was committed in conscious disregard of Lewiston's duties to the Smiths.

88.    Lewiston's intentional and malicious conduct caused injury to the Smiths -- as it was intended to do -- in the amount of more than $10,511,022.

WHEREFORE, Plaintiffs, the Smiths, respectfully request that this Honorable Court:

A.    Except the more than $10,511,022 from Lewiston's bankruptcy discharge pursuant to Bankruptcy Code Section 523(a)(6);

B.    Award interest, cost of collection and attorney fees pursuant to FRBP Rule 7008(b); and

C.    Grant such other and further relief as is here appropriate.

Respectfully submitted,

MORGANROTH & MORGANROTH, PLLC
By: /s/ Daniel E. Harold
MAYER MORGANROTH (P17966)
JEFFREY B. MORGANROTH (P41670)
DANIEL E. HAROLD (P61841)
Counsel for Plaintiffs
344 North Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
(248) 864-4000
dharold@morganrothlaw.com


SULLIVAN, WARD, ASHER & PATTON, P.C.
By: /s/ Wallace M. Handler
WALLACE M. HANDLER (P14598)
Of counsel to Plaintiffs
1000 Maccabees Center
25800 Northwestern Highway
Southfield, MI 48075-1000
(248) 746-0700
Dated: November 19, 2012          Email: whandler@swappc.com